**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

HERNAN ACEVEDO-PADILLA ET AL

    Plaintiffs

             v.

NOVARTIS EX LAX, INC.

    Defendant

**Civil No. 08-1185 (SEC)**

**OPINION and ORDER**

    Pending before this Court is Defendant Ex Lax, Inc.'s ("Defendant" or "Ex Lax") motion for summary judgment. Docket # 29. Plaintiffs Hernan Acevedo-Padilla ("Acevedo"), Nitza I. Medina-Martinez, and their conjugal partnership (collectively "Plaintiffs") opposed (Docket # 64), Defendant replied (Docket # 89), and Plaintiffs sur-replied (Docket # 101). After reviewing the filings, and the applicable law, Defendant's motion is **GRANTED.**

**Procedural Background**

    On February 12, 2008, Plaintiffs filed suit against Defendant under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq, Puerto Rico Law No. 80, P.R. Laws Ann. tit. 29, § 185(a), Law No. 100, P.R. Laws Ann. tit. 29, § 146 et seq, and Articles 1802 and 1803 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 5141 & 5142. According to Plaintiffs, Acevedo was subjected to harassment, and eventually dismissed because of his age, and replaced by a younger employee with similar job qualifications. Defendant filed its answer (Docket # 3), and discovery then ensued.

    On March 25, 2009, Defendant moved for summary judgment, arguing that Plaintiffs failed to establish a *prima facie* case of age based discrimination. Docket # 29. Specifically, Ex-Lax argues that Acevedo was dismissed because he did not meet the legitimate work

expectations, and not because of his age. Defendant further contends that Acevedo has not shown that the proffered reason for his dismissal is a mere pretext for discrimination. Defendant also argues that Plaintiffs fail to set forth a harassment claim under the ADEA. As such, Ex-Lax contends that summary judgment is warranted.

In opposition, Plaintiffs aver that Acevedo met his employer's legitimate work expectations. They further contend that Ex-Lax's proffered reasons for Acevedo's dismissal is a pretext. Specifically, they point to Carlos Ceinos ("Ceinos"), Ex-Lax's Site Leader's, alleged derogatory comments about employees in Acevedo's age range. Moreover, they argue that Acevedo received satisfactory reviews, performance bonuses and salary increases. According to Plaintiffs, Ceinos' remarks and conduct show that Acevedo's subsequent dismissal was motivated by discriminatory animus.

**Standard of Review**

FED. R. CIV. P. 56(b) provides that: "A party against whom a claim . . . is asserted   . . . may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part [of the claims asserted against him/her]."  The Court may grant the movant's motion for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ramírez Rodríguez v. Boehringer Ingelheim, 425 F.3d 67, 77 (1st Cir. 2005).  At this stage, the court examines the record in the "light most favorable to the nonmovant," and indulges all "reasonable inferences in that party's favor." Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994).

Once the movant has averred that there is an absence of evidence to support the nonmoving party's case, the burden shifts to the nonmovant to establish the existence of at least

one fact in issue that is both genuine and material.  Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (citations omitted).  "A  factual issue is 'genuine' if 'it may reasonably be resolved in favor of either party' and, therefore, requires the finder of fact to make 'a choice between the parties' differing versions of the truth at trial.'" DePoutout v. Raffaelly, 424 F.3d 112, 116 (1st Cir. 2005) (quoting, Garside, 895 F.2d at 48 (1st Cir. 1990)).  By like token, 'material' "means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant." Rojas-Ithier v. Sociedad Española de Auxilio Mutuo, 394 F.3d 40, 42-43 (1st Cir. 2005) (citations omitted). Therefore, there is a trial-worthy issue when the "evidence is such that there is a factual controversy pertaining to an issue that may affect the outcome of the litigation under the governing law, and the evidence is sufficiently open-ended to permit a rational fact-finder to resolve the issue in favor of either side." Id (citations omitted).

In order to defeat summary judgment, the opposing party may not rest on conclusory allegations, improbable inferences, and unsupported speculation. See, Hadfield v. McDonough, 407 F.3d 11, 15 (1st Cir. 2005) (citing, Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).  Nor will "effusive rhetoric" and "optimistic surmise" suffice to establish a genuine issue of material fact. Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997).  Once the party moving for summary judgment has established an absence of material facts in dispute, and that he or she is entitled to judgement as a matter of law, the 'party opposing summary judgement must present definite, competent evidence to rebut the motion.' Méndez-Laboy v. Abbot Lab., 424 F.3d 35, 37 (1st Cir. 2005) (quoting, Maldonado-Denis v. Castillo Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994)).  "The nonmovant must produce specific facts, in suitable evidentiary form sufficient to limn a trialworthy issue. . . .  Failure to do so allows the summary judgment engine to operate at full throttle." Id.; see also Kelly v. United States, 924 F.2d 355, 358 (1st Cir. 1991) (warning that "the decision to sit idly by and allow the summary judgment

**Civil No. 08-1185 (SEC)**                                                                    **4**

proponent to configure the record is likely to prove fraught with consequence."); Medina-Muñoz, 896 F.2d at 8, (quoting Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989)) (holding that "[t]he evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve").

### Applicable Law and Analysis

Before setting forth the facts found by this Court to be undisputed and relevant to the matter at hand, we must first address several compliance issues presented to the Court when reviewing Defendant's and Plaintiffs' statements of facts.

Because the instant motions are for summary judgment, the parties must comply with the requirements of Local Rule 56, and file a separate, short and concise statement of facts, set forth in numbered paragraphs, and supported by record citations as required in Local Rule 56(e). See Local Rule 56(b). In turn, when confronted with a motion for summary judgment, the opposing party must:

> [s]ubmit with its opposition a separate, short, and concise statement of material facts. The opposing statement shall admit, deny or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of material facts. Unless a fact is admitted, the opposing statement shall support each denial or qualification by a record citation as required by this rule.

Local Rule 56(c). If the opposing party fails to do so, "summary judgment should, if appropriate, be entered." Rule 56(e)(2).

Local Rule 56(e) provides that "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment." Moreover, "the court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statements of facts." Id. These rules "are meant to ease the district court's operose task and to prevent parties from unfairly shifting the

**Civil No. 08-1185 (SEC)**                                                          **5**

burdens of litigation to the court." Cabán-Hernández v. Phillip Morris USA, Inc., 486 F.3d 1, 8(1st Cir. 2007). The First Circuit has repeatedly held that when the parties ignore the Local Rules, they do so at their peril. See Ruiz-Rivera v. Riley, 209 F. 3d 24, 28 (1st Cir. 2000). Local Rule 56(c) also requires that, if the nonmoving party includes any additional facts, such facts must be in a separate section, set forth in separate numbered paragraphs, and supported by a specific record citation.

When denying or qualifying Ex-Lax's Statement of Uncontested Facts ("Ex-Lax's SUF"), Plaintiffs included additional facts that did not specifically correlate to Ex-Lax's proposed facts. More specifically, Plaintiffs failed to note that a party's denial or qualification of a proposed fact must be strictly limited to the issue therein raised. Any additional information shall be included in a separate section in order to ease the Court's task. In fact, a substantial part of Plaintiffs' additional facts are later included in a separate section of additional facts.  As a result, Plaintiffs have filed hundreds of pages of repetitive arguments, which is precisely what Rule 56 seeks to avoid, forcing the opposing party and the Court to revise numerous pages of sometimes repetitive and irrelevant information. Accordingly, any additional facts provided by Plaintiff when denying or qualifying Ex-Lax's SUF will be disregarded by this Court. Notwithstanding, Plaintiff's additional facts at Docket # 57, pp. 102-120 are deemed admitted when supported by the record, and not properly controverted by Ex-Lax.  Ex-Lax also ran afoul of Local Rule 56 when citing numerous pages of their reply when opposing Plaintiffs' facts, instead of providing concise and specific responses. This Court will not cite all the instances in which the parties failed to comply with the applicable rules in their over 500 pages of arguments. Suffice it to say that this has unduly burdened our task far beyond the reasonable boundaries, thus counsel are strongly advised to refrain from similar conduct in the future.

After reviewing the filings, the relevant uncontested facts are as follows.

**Civil No. 08-1185 (SEC)**                                                        **6**

Ex-Lax is a pharmaceutical corporation that manufactures over-the-counter products, including laxatives. Ex-Lax's SUF ¶ 1. Ex-Lax's operations are highly regulated and monitored by the Food and Drug Administration and are required to fully comply with the Good Manufacturing Practices (hereinafter referred to as "GMP's"). Id.[1]

In April 2003, Ceinos became Ex-Lax's Site Leader. Ex-Lax's SUF ¶ 18. He is a Chemical Engineer; with a bachelor's degree in Chemical Engineering from the University of Puerto Rico, Mayagüez Campus. Id. at 17. Ceinos also earned a master's degree in Chemical Engineering from the same university. Id. As Ex-Lax's Site Leader, Ceinos is responsible for the overall operations of Ex-Lax's site. Id. at 19. He is responsible for establishing the company's goals and objectives for the areas of finance, manufacturing, quality assurance, health, safety and environment, human resources, compliance, materials management, and maintenance functions. Id. He is also the liaison with corporate headquarters to ensure that all objectives are achieved on schedule and within overall corporate philosophies. Id.

As Ex-Lax's Site Leader, Ceinos is also in charge of evaluating the performance of Ex-Lax's departments' managers. Ex-Lax's SUF ¶ 20. Furthermore, as part of his duties, Ceinos

---

[1] GMP's refer to the Good Manufacturing Practice Regulations promulgated by the US Food and Drug Administration under the authority of the Federal Food, Drug, and Cosmetic Act. Ex-Lax's SUF ¶ 2. These regulations, which have the force of law, require that certain manufacturers and packagers of certain drugs and medical devices take proactive steps to ensure that their products are safe, pure, and effective. Id. GMP regulations require a quality approach to manufacturing, enabling companies to minimize or eliminate instances of contamination, mix-ups, and errors. Id. at ¶ 3. This, in turn, protects the consumer from purchasing a product which is not effective or even dangerous. Id. Failure of firms to comply with GMP regulations can result in very serious consequences including recall, seizure, fines, and jail time. Id. GMP regulations address issues including recordkeeping, personnel qualifications, sanitation, cleanliness, equipment verification, process validation, and complaint handling. Id.

**Civil No. 08-1185 (SEC)**                                                               **7**

scrutinizes the Unplanned Deviation Reports[2] generated by investigation teams at the site. Id.

*Acevedo's Background and Employment History*

Acevedo was born on May 19, 1951.  Plaintiff's Additional Facts ("PAF"), Docket # 57, ¶ 81. He earned a bachelors degree in Mechanical Engineering in 1974 from the University of Puerto Rico; is a licensed professional engineer since 1976; has taken post-graduate courses; is an energy engineer; and was certified as a construction manager which includes management of projects. Ex-Lax's SUF ¶ 4; PAF ¶¶ 1-5. Plaintiff's prior performance evaluations at other companies were excellent. PAF ¶ 6.[3]

In 1996, Acevedo was hired by Ex-Lax as the Maintenance and Engineering Manager. Ex-Lax's SUF ¶ 5. As Ex-Lax's Maintenance and Engineering Manager, Acevedo was in charge of maintaining the plant's facilities in optimum conditions, including the production machinery, the treatment plant, landscaping, and building services. Id. at 6. Acevedo was also in charge of providing engineering support to all of the company's departments, and developing and implementing the company's capital projects. Id.

_____

[2]   An Unplanned Deviation Report is a technical document in which a deviation from an Ex-Lax's Standard Operating Procedure ("SOP") is thoroughly analyzed in order to ascertain the "root cause" of such deviation and to take corrective and preventive actions for its elimination, as well gauge the impact that the deviation at issue had on Ex-Lax's products. Ex-Lax's SUF ¶ 20.

[3]   Although Ex-Lax posits that Acevedo's previous work experience and performance is irrelevant to said inquiry, courts have held otherwise. An employee may show that he possessed the necessary qualifications and adequately performed his job through proof of positive performance evaluations and raises earned from the employer. Rodriguez-Torres v. Caribbean Forms Mfr., Inc., 399 F.3d 52, 62 (1st Cir. P.R. 2005) (citing Woodman v. Haemonetics Corp., 51 F.3d 1087, 1092 (1st Cir. 1995)). Moreover, the First Circuit has rejected the notion that prior work experience is irrelevant for all purposes in an employment discrimination case.  Id. at n. 8. Accordingly, in Rodriguez-Torres, the Court concluded that "the district court acted within its discretion in admitting as relevant that [Plaintiff] obtained [relevant] knowledge [to do her job] from prior employment." Id.; see also Woods v. Friction Materials, Inc., 30 F.3d 255, 261 (1st Cir. 1994). As such, it stands to reason that Plaintiff's proposed facts regarding his past work experience are relevant for purposes of the present motion.

Civil No. 08-1185 (SEC)                                                                                    8

Specifically, Acevedo's duties and responsibilities included the following: (i) supervise all functions related to the maintenance, building services, and engineering services;[4] (ii) responsible for the computerized maintenance management system for production, machinery and utilities, and management of the computerized maintenance system that issued work orders related to the maintenance of the plant facilities; (iii) responsible for supervising the major contract works, assuring that all elements were carried out in a timely and cost-conscious fashion, ensuring that the entities contracted by the company completed the work in a manner that was cost-effective and timely; (iv) responsible for all functions related to the record-keeping of all preventive maintenance files for the department;[5] (v) responsible for purchasing supplies related to the building's facilities, assuring the best quality and prices from outside vendors; (vi) responsible for the budget accounts related to purchase of materials and machine parts and chemicals used for the cleansing and sanitation of the plant's facilities; (vii) performed employee performance appraisals and salary increase recommendations; (viii) provided engineering support to all departments, including feasibility studies, CAR ("Capital Appropriation Requests") preparation, execution and validation; (ix) responsible for attending professional seminars with the purpose of acquiring technical and professional knowledge in the maintenance, engineering, safety and environmental areas; (x) ensure health, safety and environmental ("HSE") matters were taken into account in all decisions and activities; and (xi)

-------

[4]   According to Acevedo, he was responsible for supervising all of the maintenance, building services, and engineering functions. As it related to these duties, Acevedo reported to Ex-Lax's Site Leader. Acevedo also acknowledged in his deposition that he did not know if any other Ex-Lax manager had the same duties and responsibilities as he did in relation to the maintenance, building services, and engineering of the plant.

[5]   Insofar as Ex-Lax admits that whether Acevedo was the custodian of the personnel files of the Maintenance and Engineering Department is immaterial for purposes of the present motion, said portion of their SUF ¶ 7(iv) will be disregarded by this Court.

**Civil No. 08-1185 (SEC)**                                                                          **9**

ensure that all associates comply with HSE guidelines and applicable laws. Ex-Lax's SUF ¶ 7(i)-(xi).

On May 17, 2004, Acevedo received an orientation regarding Ex-Lax's "Equal Employment Opportunity and Affirmative Action Policy" (hereinafter referred to as "EEO Policy.") Ex-Lax's SUF ¶ 118. The EEO policy states that any employee who believes that he/she or another employee has been the subject of discrimination based upon a protected characteristic should properly report the alleged charge to his/her immediate supervisor, any member of management, or his or her Human Resources representative. Id. at 119. This enabled the company to investigate and resolve any problem promptly and effectively. Id. Acevedo acknowledged that such policy provides that if an Ex-Lax employee feels discriminated, he/she should file a complaint in the Human Resources Department ("HR Department"). Id. at120.

*Ex-Lax's disciplinary policy*

Ex Lax has a progressive disciplinary policy which is implemented before an employee is discharged. PAF ¶ 34 & 85. On July 1, 1998, Elizabeth Rodriguez ("Rodriguez"), Ex-Lax's former HR Manager, prepared the progressive policy of the company, entitled "Disciplinary Action Guide" which requires that before termination, a memorandum with the reasons for the termination must be prepared and approved by the Human Resources Department. Id. at 92. The company's *modus operandi* as it related to the disciplinary process was to place the employee in a progressive disciplinary process. Id. at 93. Pursuant to Ex Lax's policy, all disciplinary actions had to be approved by the HR Department. Id. at 94. The Site Leader and Managers always consulted with the HR Department before any disciplinary action was taken. Id. at 95. Ex Lax's progressive disciplinary policy has a disciplinary action report, which according to Jose Pabellon ("Pabellon"), Ex-Lax's HR Department's manager when Acevedo was terminated, is still used by the company and applied to all employees. Id. at 87-89. The Site Leader uses the disciplinary process to admonish the Managerial personnel. Id. at 86. Ceinos

claims that he respected the company's policy and that everybody must comply with the policy, without exception. Id. at 90.

According to Rodriguez, an employee with a negative evaluation or who partially meets the expectations must be placed in the Performance Improvement Plan ("PIP"). PAF ¶36. The PIP is a tool used by managers in Ex-Lax to enhance their ability to assist individual employees improve their performance, correct an unsatisfactory performance review, and provide documentation follow-up and disciplinary action as needed. Ex-Lax's SUF ¶ 67. Rodriguez testified that, to the best of her knowledge, the performance evaluations are not used as an instrument to discipline the employees. PAF ¶ 30. The disciplinary actions are aimed at obtaining an immediate positive result or to correct a mistake immediately, while a performance evaluation is focused on the performance specifically, which is adhered to the objective of the evaluation. Id. at 91. Rodriguez stated that, if an employee succeeds a PIP, the factors that motivated the PIP cannot be used in support of discharging the employee.  Id. at 117 & 118. That is, the reason for the discharge has to be different from the cause that originated a PIP that is closed.  Id. at 118. Otherwise, it would constitute double penalty for the employee. Id. at 119.

Pabellon admits that the performance evaluations are not disciplinary actions. Id. at 31 & 101. According to him, the disciplinary policy must be complied with and all disciplinary actions must be documented; the policy requires first, an orientation to the employee, second, to verbally advise, third, a written warning; fourth is the suspension and, fifth is the termination. Id. at 99 & 100. However, Pabellon stated that Ex-Lax usually disciplines exempt employees through the use of memorandums or the mid-year and annual performance reviews; thus exempt employees are not usually disciplined through the standard disciplinary forms, and instead the areas to be improved are identified by means of the afore-mentioned memos or reviews. See Docket # 89, pp. 463 & 467-68.

*Acevedo's Performance prior to 2004*

The results of Acevedo's first performance evaluation at Ex-Lax was superior performance. PAF ¶ 7. Ivan Marti ('Marti'), Ceinos' current supervisor, evaluated Acevedo on two occasions for two years, and rated his performance as a strong performer and exceeding expectations. Id. at 8. Plaintiff's former supervisor, Santos Troche Pabón, rated his overall work performance in 1999 as fully meeting Ex Lax's expectations. Id. at 9. In the Competence section, Troche stated that he "consider[ed] Hernan to be highly competent and possess the skills to have a great impact on our operations." Id. at 10. Troche further concluded that Plaintiff exceeded expectations in the Competent criteria by giving him a rating of 3 points. Id. The evaluation also concluded that the plant was kept in optimal working/production conditions in 1999 with the exceptions of incidents related to sanitary water problems and incoming water as they were out of Acevedo's control. Id. at 11. In the "Customer and Quality Focus section," it was determined that Acevedo "[a]ssigns highest priority to customer satisfaction." Id. at 12. According to Plaintiff's 2002 evaluation, his former supervisor, Jorge Zayas ("Zayas"), rated him as a strong performer. Id. at 13. He was described by Zayas as follows: "Hernan Acevedo is a customer and quality focus manager." Id. at 14.  In 2004, Acevedo received an evaluation below his expectations for the first time. Id. at 33.

The HR Department was the custodian of the personnel files. PAF ¶ 17. Pabellon testified that he did not find Acevedo's evaluations from the years 1996 to 1998 and 2000 to 2002 in his personnel file. Id. at 14. He further admitted that Acevedo's evaluations should have been in said file. Id. Pursuant to Ex Lax's "Access to Associate Personnel Filed" policy, effective January, 2005, employees' performance appraisals are kept in the personnel files and may not be removed from the HR Department. Id. at 16. According to Rodriguez, when Ceinos was hired as the company's Site Leader, he requested the managers' personnel files, and thereafter, he kept the files in his desk. Id.

The performance bonuses awarded to the managers are authorized by said manager's supervisor. PAF ¶ 18. Specifically, Ceinos and his supervisor, Marti, must approve the performance bonuses, based upon the employee's evaluations, the performance of Ex-Lax's facility in Puerto Rico and of the Ex-Lax division where the employee works. Id. at 19. On March 13, 2007, Plaintiff received a bonus in the amount of $13,166.00. Id. at 20. Plaintiff also received the following bonuses: $15,870.00 in 2000; $17,136.00 in 2001; $12,014.00 in 2002; $9,921.00 in 2003; $13,969.82 in 2004; and $6,644.00 in 2004. Id. at 21-26. Plaintiff was also awarded a bonus in the year 2005 upon receiving a performance rate of 2.2, which according to Pabellon, means a "strong performance." Id. at 27. Plaintiff received the document of the bonus approval for his performance in 2006 with his evaluation, and he kept a copy of the same. Id. at 29.

*Acevedo's Responsibilities at Ex-Lax*

One of the contractors under Acevedo's direct supervision was One Source, an entity that offered janitorial services for Ex-Lax. Ex-Lax's SUF ¶ 8. One Source's janitors reported directly to One Source's supervisor, who, in turn, was accountable to Acevedo. Id.  Acevedo was responsible for the administration of the contract between Ex-Lax and One Source; no other manager in Ex-Lax had that responsibility. Id. at 9.  Another major contractor that was under Acevedo's supervision was Ecolab, an entity that provided pest control services to Ex-Lax. Id. at 10. Acevedo was also responsible for the administration of the contractual relationship between Ex-Lax and Ecolab. Id. at 11. Acevedo ensured that Ecolab complied with its obligations pursuant to the contract subscribed by Ex-Lax and Ecolab, and that Ecolab performed its contractual duties in accordance with Ex-Lax's Standard Operating Procedures ("SOP"). Id.

Ex-Lax's Pest-Control Procedure describes the duties and responsibilities for Ex-Lax's Pest-Control Program. Ex-Lax's SUF ¶ 12. Ex-Lax's Maintenance and Engineering Department

was in charge of the supervision of Ex-Lax's pest control. Id. at 13. As Ex-Lax's Maintenance

and Engineering Manager, Acevedo was responsible for the following duties related to the

Pest-Control Procedure: monitor the Pest-Control Program; ensure compliance with the

Pest-Control Procedure; train contractors on the Pest-Control Program and company policies

and procedures; document deviations from the Pest-Control Procedure; take appropriate

measures to ensure effectiveness of the Pest-Control Program; ensure that monthly plan

inspections were conducted; and ensure the use of federal regulated insecticide, fungicide and

rodenticide. Id. The pest-control contractor, Ecolab, had the following responsibilities as to

Ex-Lax's pest control: execute the approved actions for controlling pests; and communicate

immediately with the Maintenance and Engineering Manager, and the Compliance Officer about

any deviation that may have occurred. Id. at 14.

Acevedo was also responsible for making sure that Ecolab executed the fogging

("fumigating") process in accordance with Ex-Lax's Pest-Control Procedure and the SOP's, and

that the set objectives be complied with. Ex-Lax's SUF ¶ 15. Acevedo ensured that Ecolab

executed its contractual obligations in an effective manner; he was the one responsible for

maintaining Ex-Lax's plant and facilities free from rodents and insects. Id. Moreover, Acevedo

had to guarantee that Ecolab executed its responsibilities in a way that the integrity and the

security of Ex-Lax's raw materials and products be secured. Id. at 16. In sum, Acevedo had to

make sure that Ecolab did not damage Ex-Lax's equipment, machinery, products and raw

materials while executing its contractual obligation related to pest control. Id.

*Rodent in Ex-Lax's Plant in 2004*

On January 17, 2004, a live rodent was found in the packaging area near the chocolate

line. Ex-Lax's SUF ¶ 23. The packaging line was immediately stopped and the production put

on hold. Id. An investigation was conducted by the following persons: Johanna García,

Compliance Officer; Jerry Martínez, Production Manager; Ángel Lazú, Maintenance Technician; Norma León, Quality Assurance Supervisor; and Acevedo. Id.

The investigation team found that a building renovation had been performed in the plant since December 30, 2003, which involved the men's and women's restrooms, the gowning rooms, and the Gas-X Manufacturing Area. Ex-Lax's SUF ¶ 24. The investigation noted that, during the renovation, in certain instances, the emergency exit door of Ex-Lax's cafeteria hall and the employees' entrance door were opened to allow the contractors access for the movement of construction materials and that, on several occasions, these doors had remained opened for more than the necessary time. Id.

Furthermore, upon the incident, a physical inspection of the premises was performed by Ecolab and Ángel Lazú on January 17, 2004. Ex-Lax's SUF ¶ 25. During the inspection, several glue traps, which were used to prevent the entrance to the facility of crawling insects, were not in place. Id. Moreover, three rat baits located outside the cafeteria hall's emergency exit door were not in place. Id. In addition, during the inspection made by Ecolab and Ángel Lazú, they found that the packaging area and cafeteria hall emergency doors had small gaps between the doors and the floor. Id. Acevedo acknowledged in his deposition that the investigation team found that several glue traps, used to prevent the entrance of crawling insects, were not in place as required by the Pest Control SOP. Id. at 26. Acevedo further admitted that the department that he managed - the Maintenance and Engineering Department - was responsible for making sure that the glue traps were placed in accordance with the Pest-Control Procedure. Id.

The investigation team concluded that it was very possible that the live rodents found on the packaging area on January 17, 2004 gained access to the plant through the cafeteria hall emergency exit doors during the last days of construction, since said doors remained opened for more than the necessary time. Ex-Lax's SUF ¶ 27. Ceinos became aware of the January 2004

rodent incident and its possible causes through the Investigation Report that Acevedo prepared. Id. at 28.

*Microbial incident in 2004*

On September 30 and October 18, 2004, laboratory tests confirmed the presence of a bacteria known as Staphylococcus aureus on Ex-Lax's Gas-X Super Extra Strength Soft Gel 30 Lots No. 98225 and 98269. Ex-Lax's SUF ¶ 29. Following the results of the test, Acevedo; Clarissa Pulliza (Pharmaceutical Technologist); Jerry Martinez (Production Manager); and Norma León (Quality Assurance) began an investigation of the microbial incident. Id. The team found that the men's and women's former bathrooms located near the production area were dirty and that the exhaust fan was not working. Id. at 30. Evidence of mold on the bathroom walls and doors, as well as a strong odor, was perceived inside the bathrooms. Id. The investigation team concluded that the presence of Staphylococcus aureus, a highly recognized contaminant from human source, in lots nos. 98225 and 98269 was caused by certain conditions, which included the fact that a source of contamination was coming from the men's and women's bathrooms near the packaging area, and that one of the operators who participated in the inspection process of these lots was confirmed to be sick, increasing the probability of contamination. Id. at 31; Docket # 57, p. 22, ¶30.2.

Acevedo acknowledged during his deposition that the restrooms' contamination could have been prevented if there had been an established policy and program of verifying and cleaning the restrooms on a daily basis. Ex-Lax's SUF ¶ 32. However, Acevedo acknowledged that such measures had not been taken before the Staphylococcus aureus incident occurred in 2004. Id. As a result of the positive results for Staphylococcus aureus on the Gas-X Super Extra Strength Soft Gel 30, Lots No. 98225 and 98269, the lots were rejected by Quality Assurance and disposed of; the Gas-X Super Extra Strength Soft Gel 50, Lot No, 98275, which was packaged immediately after Lot No. 98269, was also rejected. Id. at 33. Ceinos became aware

of the 2004 microbial incident and its possible causes by means of the Unplanned Deviation Report. Id. at 34.

*Packaging Process Deviation*

On September 14, 2004, José Colón (Mechanical Engineer) Ángel Lazú (Mechanic), and José Méndez (Mechanic), all from the Maintenance and Engineering Department, were installing and setting up a new brush box for the packaging of Gas-X Maximum Strength Soft Gels 50, Lot No. 98216. Ex-Lax's SUF ¶ 36. During the line's set-up, they became aware that the positioning of the brushes inside the brush box was not correct. Id. at 37. They changed the position of the brushes without the appropriate deviation approval from the Production and Quality Departments. Id. On that same date, during the set-up for the packaging line, the same employees installed a new acrylic box in the brush box and evaluated the effect of the acrylic box on the packaging operation of Gas-X Maximum Strength Soft Gels. Id. at 38. The packaging operation of Gas-X Maximum Strength Soft Gels 50, Lot No. 98216, began after the acrylic box was cleaned and installed. Id. This modification was implemented without the appropriate deviation approval from the Production and Quality Departments. Id. The deviation did not have a negative impact on the quality of the product. Docket # 57, p. 32, ¶ 38.3.

Prior to any changes, the members of the Maintenance and Engineering Department were required to prepare a change control document and submit it to Quality Assurance and Production for their review and approval, certifying that the proposed changes were supported by the supplied justification, and assuring that all affected systems, processes, documents, validations and departments were identified on the change control form. Ex-Lax's SUF ¶ 39. After the brush box incident, the personnel from the Maintenance and Engineering Department were trained on the procedures for change control; all supervisors, managers and all persons covering change control procedures were also trained. Docket # 57, p. 32, ¶ 42.1 & 42.2.

**Civil No. 08-1185 (SEC)**                                                                                 **17**

*Rodents in the Chocolate Manufacturing Area in June 2004*

On June 4, 2004, a contractor from One Source found traces of a ceiling tile on the floor of the chocolate manufacturing area. Ex-Lax's SUF ¶ 44. Acevedo and the Supervisor of Ex-Lax's building services contractor, One Source, were immediately informed of the situation, and an investigation was initiated. Id. The investigation team was composed of Acevedo; Nydia Acevedo (Quality Assurance Associate Director); José Colón (Mechanical Engineer); and Jerry Martínez. Id. On June 5, 2004, an entomologist contracted by Ex-Lax as a consultant, Osvaldo Cotte, and an Ecolab technician, performed an inspection of the chocolate manufacturing area, and the entomologist confirmed that the incident was the result of rodent activity. Id. at 45.

On June 6, 2004, one small live rodent was captured inside the chocolate manufacturing area in one of the glue traps installed the previous day. Ex-Lax's SUF ¶ 46. The glue trap was located on the acoustic ceiling area above the chocolate room. Id. That same day, the entomologist visited the area again, and confirmed that the captured rodent was consistent with the evidence of rodent activity found by him on June 5, 2004. Id.

On June 10, 2004, a maintenance technician performed an inspection and found that there was a hole in one of the exhaust fans, which was not in use, located in the ceiling of the Quality Assurance Laboratory. Ex-Lax's SUF ¶ 47. According to the investigation, there was a high probability that the rodent gained access through that hole. Id. On that same date, the exhaust fan was removed, and the opening was sealed. Id. at 48. Due to the rodent's activity, Ex-Lax's chocolate laxative batch no. 60337 was rejected. Id. at 49. Acevedo acknowledged that a way to prevent the rodents from entering the plant through the holes in the ceiling was to seal such holes with a metal plate. Id. at 50. However, Acevedo acknowledged that the measure was not taken before the rodents' presence in the room, notwithstanding, he implemented the measure after that incident occurred. Id. Acevedo stated in his deposition that, during the investigation conducted with regards to the rats' presence, he found two holes instead of one.

**Civil No. 08-1185 (SEC)** **18**

Id. at 51. Ceinos became aware of the second rodent incident and its possible causes by means of the Unplanned Deviation Report. Id. at 52.

*Acevedo's 2004 Performance Review[6]*

The previously identified incidents appear in Acevedo's 2004 performance evaluation, dated March 3, 2005. Ex-Lax's SUF ¶ 57. Pursuant to the 2004 review, Acevedo did not meet the expectations within the following areas of the "Values and Behaviors" section: Result Driven, Customer-Quality Focus, and Leadership. Id. at 60.  In the Overall-Manager Appraisal, Ceinos rated Acevedo as "Partially Met Expectations." Id. at 59 & 61.  Acevedo rated himself as "Partially Met Expectations" only in the "Customer-Quality Focus" area. Id. at 62. In such value and behavior, Acevedo commented the following: "Mainly, customer (production) complaints increased during Year 2004. Packaging Machinery downtime sometimes looked out of control. There were certain situations where the focus on quality was not attained. Example: Change controls not submitted, Pest control issues and microbiology OOS results due to the failure of an exhaust." Id.

Acevedo rated himself as "Fully Met Expectations" in every area except in "Customer-Quality Focus." Ex-Lax's SUF ¶ 64. However, Ceinos' comments in the areas of "Leadership," "Empowerment-Accountability," and "Open Communication/Collaboration/Compassion," reflected otherwise. As to "Leadership," Acevedo stated that "[d]ue to the organization structure, sometimes I do not spend the required time with each of my employees. All of them including contractors employees and employees of other

---

[6] The Performance Reviews are divided into two sections, "Objectives" and "Values and Behaviors." Each section is then divided into different sections or areas for which the employee is reviewed. The employee and the supervisor rate the employee's performance in each section or area, and they both award a rating. Thus the employee's self-appraisal and the supervisor's appraisal are not necessarily the same. The employee and the supervisor may include comments in each section. The ratings are as follows: 1 = "Partially Met Expectations", 2 = "Fully Met Expectations", and  3 = "Exceeded Expectations".

areas see me as a leader that they can count with." Id at 64. Regarding this issue, Ceinos noted that "[a] key characteristic of leadership is the ability to establish clear directions and align associates behind common objective. Clear directions were not provided to the associates as shown by the inadequate maintenance of the packaging restrooms and incidents like the [un]authorize[d] interventions on the packaging. Important projects had delays beyond the acceptable limits, examples are: 1) The cutting die replacement for IMA–2 2) Installation of a new banding machine on the chocolate packaging lines 3) The brush box for IMA-2 4) The gowning rooms refurbishing. It is expected to encourage right behaviors and correct others. An engineering associate has obtained consistently low performance ratings and no action has been taken." Id. at 63.

As to "Empowerment-Accountability," Acevedo stated: "I always feel responsible to what my Department does, good or bad. I am fully accountable of situations that happened on Pest Control, compressed air, Micro OOS and packaging equipment issues." Ex-Lax's SUF ¶ 64. On this issue, Ceinos wrote: "I agree that you are fully accountable for the situations concerning Pest Control, compressed air, Micro OOS and packaging equipment. These are significant issues that negatively impacted the performance of the site by stopping or slowing our ability to produce product." Id. at 63.

As to "Open Communication/Collaboration/Compassion,"Acevedo admitted that "[t]he flow of information is not always the best. Communication with the production Department and Q/C must improve during year 2005." Ex-Lax's SUF ¶ 64.  Ceinos agreed, stating that "[c]ommunication has not been as clear as expected intra-inter department. Examples of poor communication are: 1) the painting of the GAS-X blending room without the authorization of the production manager, this action caused a manufacturing delay when facing a severe backorder situation. 2) The changing of a motor in the chocolate packaging line without the

**Civil No. 08-1185 (SEC)**                                                                                               **20**

authorization of the production manager, this action caused a delay in the packaging operations." Id. at 63.

In "Result Driven," Acevedo stated that "[i]n this area sometimes due to the pressure to attain the production schedule, results are not as acceptable as they should be. Examples: Installation of new potable water piping, Brush box, Qualification of Gas-X with Maalox tablets change parts." Id. at 63.

As a result of Acevedo's performance in 2004, Ex-Lax and Acevedo executed a PIP for Acevedo that allowed him the opportunity to demonstrate his willingness to retain his employment by improving his performance. Ex-Lax's SUF ¶ 65. Acevedo acknowledged that, based on his 2004 Annual Performance Review results, a PIP had to be put into place. Id. at 68. The purpose of Acevedo's 2005 PIP was to identify the specific performance problems and the specific improvement plan that he had to successfully complete to meet the basic criteria of his position. Id. at 66. Pursuant to the PIP, Acevedo was given ninety (90) days to successfully complete the program and achieve a "Fully Met Expectations" status to retain his employment. Id. at 69. The PIP period began on March 22, 2005 and ended on June 22, 2005. Id. Acevedo's PIP stated that, even after the successful completion of the plan, Acevedo's improvement had to be continued, consistent and sustained. Id. at 70. If Acevedo failed to maintain continued, consistent, and sustained improvement, Ex-Lax reserved the right to take appropriate action up to and including termination. Id. Acevedo understood that the PIP document stated that his termination was a possible outcome if he did not display a continued, consistent and sustained improvement in his performance. Id. Acevedo complied with the requirements set forth in the 2005 PIP and retained his employment as Maintenance and Engineering Manager. Id. at 71. As a result, Ceinos rated Acevedo as "Fully Met Expectations" in the mid-year and annual 2005 performance reviews. Id.

**Civil No. 08-1185 (SEC)**                                                                 **21**

*Total Organic Carbon ("TOC") Parameter Incident in 2006*

During the afternoon of June 5, 2006, a Quality Control Analyst informed the Quality Assurance Supervisor that a test on purified water[7] samples revealed that the TOC was above the acceptable limit. Ex-Lax's SUF ¶ 73. As a result, an investigation was initiated; the investigation team was composed of Acevedo; Myriam L. Martínez (QA Compliance Assurance); Jerry Martínez (Production Manager); and Norma León (Quality Assurance Supervisor). Id. at 74. The investigation's findings revealed that personnel from the Maintenance and Engineering Department changed the Continuous Dialization Unit ("CDI") in the equipment that creates the purified water used to manufacture Ex-Lax's products. Id. at 75. The Engineering and Maintenance Department must notify the Production and QC Departments of the intervention with the equipment. Id. at 76.

When the high TOC levels were discovered, the manufactured products had to be discarded. Ex-Lax's SUF ¶ 78. This negligence represented a $39,072.71 loss for Ex-Lax. Id. The investigation team concluded that the Maintenance and Engineering Department personnel failed to notify the Production and Quality Departments of the high TOC levels, and the products were manufactured. Id. at 77. The CDI change, and lack of flushing, caused the TOC levels to elevate to unacceptable levels. Id. The investigation team also concluded that, based on the results of the investigation, the root cause for the high TOC levels was the need of required training for the Maintenance and Engineering Department personnel. Id. at 79. As a general practice, when an intervention is made on the equipment that creates the purified water used to manufacture Ex-Lax's products, the operator must continue to flush the equipment until the TOC levels are stable at acceptable levels. Id. However, this was not done by the Maintenance and Engineering Departments' personnel. Id. The operator started up the system

_____

[7] Purified water is used for manufacturing Ex-Lax's products. Ex-Lax's SUF ¶ 73.

without the flushing. Id. Furthermore, the investigation team concluded that the Quality and Production Departments had to be informed about the change of the CDI.  Id. at 80. Acevedo admitted that the personnel that changed the CDI did not have the complete training. Id. at 81. Notwithstanding, Acevedo pointed out that he was on vacation on the date this incident occurred, and that Angel Alsina was in charge of the department at that time. Docket # 57, p. 62, ¶ 75.1.

Ceinos became aware of the TOC incident and its possible causes through the Unplanned Deviation Report. Ex-Lax's SUF ¶ 82.

*Fogging Incident in 2006*

In the week of June 19, 2006, the Quality Assurance Compliance Area audited the maintenance area. Ex-Lax's SUF ¶ 84. During the evaluation of the pest control documentation, Quality Assurance found that a fogging using BP-100 (pest control technique that uses smoke or vapor) was performed on June 14th, 2006, and that there was no objective evidence to support that the necessary precautions were taken as to avoid potential exposure to the equipment or products in the maintenance area. Id. An investigation immediately ensued; the investigation team was composed of Acevedo; Jerry Martínez (Production Manager); Norma León (QA Supervisor); and Jorge Cabrera (QC Associate Director). Id. at 85.

After the investigation concluded, the team produced the following factual findings. On June 13, 2006, a Production Associate informed Acevedo of the sighting of a dying cockroach next to the west wall of the chocolate manufacturing area. Ex-Lax's SUF ¶ 85(i). The same day, Acevedo informed Ecolab of the cockroach situation. Id. at 85(ii). Ecolab and Acevedo agreed that the inspection visit of the pest control supply would be done the next day, June 14, 2006. Id. at 85(iii). Ecolab was also scheduled to perform the monthly regular service on that day. Id. An Ex-Lax representative (an employee for the janitorial service One Source) received Ecolab's personnel, and after they performed the regular service, they proceeded with the fogging to the

Civil No. 08-1185 (SEC)                                                            23

knock-out and chocolate manufacturing area. Id. at 85(iv). Following the inspection of the area by Ecolab and an Ex-Lax representative, it was decided to proceed with the fogging to the knock-out and chocolate manufacturing areas. Id. at 85(v). The fogging was done between 11:00 a.m. and 11:30 a.m. with an insecticide called BP-100. Id. at 85(vi). On the day of the fogging, the chocolate manufacturing kettle, batch no. 60404, was being mixed. Id. at 85(vii). After the fogging, the Production Department did not clean the equipment that was used to manufacture the products, that is, before the manufacturing process began. Id.; Docket # 57, p. 72, ¶ 85(vii).  Even though there was no clear evidence of exposure to the insecticide during and after the fogging, Ex-Lax's chocolate batch no. 60404 was rejected. Ex-Lax's SUF ¶ 85(vii); Docket # 57, p. 72, ¶ 85(vii). This represented a loss of approximately $91, 098.18. Ex-Lax's SUF ¶ 88.

       The "Root Causes Evaluation" of the investigation states that the instructions given by the Maintenance Manager to the employee who accompanied Ecolab's personnel were not clear as to the application of the contact insecticide in the chocolate manufacturing area, and the steps to be followed before and after the application. Ex-Lax's SUF ¶ 86. As a result, the Ecolab employee assumed that because the equipment was covered, the area was prepared for the fogging and everybody had been informed about it. Id. Moreover, the investigators concluded that the Pest-Control Procedure was not specific in the communication steps to be followed when a situation of this nature, like the finding of a cockroach or another pest, occurs. Id. at 87. According to the report, the procedure failed to establish what to do before, during, and after a pest control activity takes place. Id.  In the conclusion, the investigation team stated that the fogging without the necessary precautions was associated to inadequate written procedure to address any reported incidence of pest in the production areas. Docket # 57, p. 70-71, ¶ 84.2.

       Ceinos became aware of the fogging incident and its causes through the Unplanned Deviation Report. Ex-Lax's SUF ¶ 89.

**Civil No. 08-1185 (SEC)**                                                    **24**

*Spare parts room, Machine shop and USP Water Room*

In 2006, Ceinos went on two routine walks on two different occasions and visited the plants' facilities.  Ex-Lax's SUF ¶ 90.  In three of the areas, namely, the spare parts room, the machine shop and the USP water room, Ceinos found what he deemed lack of cleanliness and disorganization. Id. Ceinos believes that the rooms were in unacceptable conditions and in clear violation of the GMP's. Id. The spare parts room was disorganized because, among other things, there was no control over the inventory, which caused a problem in the operations since the parts that were needed to properly maintain the equipment were not present in the room on occasions. Id. at 91. The GMP's strictly apply to these three rooms since the parts present in the spare parts room and in the machine shop are used in the equipment that is used to manufacture Ex-Lax's products. Id. at 92. Also, the purified water that is produced in the USP water room is used to manufacture Ex-Lax's products. Id.

Carlos Marin was the stock room clerk, under Acevedo's supervision. Docket # 57, p. 80, ¶ 90.11. In 2006, new cabinets were installed to organize the cabinets in the stockroom. Id. at p. 79-80, ¶ 90.3, 90.4 & 90.6-90.8.

*Acevedo's 2006 Mid-year Performance Review*s

Ceinos stated in Acevedo's 2006 Mid-year Performance Review "Leadership" category that "[t]he group must be motivated to guarantee execution of activities without mistakes." Ex-Lax's SUF ¶ 95. In said review, regarding the high TOC levels in the purified water and the fogging process, Acevedo specifically stated: "[t]he focus on Quality has been affected by two Unplanned Deviations. Two issues, coating with Purified water with high TOC and fogging in the Choc. Mfg. Room without taking the appropriate measures. Rejection of two lots due to this at a cost of around $90,000.00 dollars." Id. at 96. As to these incidents, Ceinos stated that "[a]s explained by Hernán [Acevedo], both incidents had significant financial implications for the operation." Id. at 98. Ceinos further stated, in the "Customer/Quality Focus" area that "[i]t is

expected to improve the organization of housekeeping of areas [sic] under the responsibility of the Engineering department like: Stock Room, Boilers Room, Machine Shop, etc." Id. at 99.

In the "Empowerment-Accountability" area, Acevedo also stated that he was "[r]esponsible for all the matters related to the maintenance and engineering area. I am accountable and accept the calculated risks. I give responsibility to the mechanics and they accept it." Ex-Lax's SUF ¶ 97.

*Ex-Lax's Capital Projects*

In 2006, a capital appropriation's request was submitted for the reconstruction of a room and the acquisition of additional new equipment. Ex-Lax's SUF ¶ 102. This project was related to Ex-Lax's new product known as "thin strips." Id. However, the project became very costly and was extremely disorganized; it entailed a cost of 4 to 6 million dollars. Id. Acevedo delayed in informing that the project was exceeding the expected costs. Id.

*Acevedo's 2006 Annual Performance Review*

In most of the criteria in the 2006 annual evaluation, Ceinos rated Acevedo as "Partially Met Expectations." Ex-Lax's SUF ¶ 103. Specifically, the Overall Manager Appraisal with regards to Ex-Lax's "Values and Behaviors," Acevedo was rated as "Partially Met Expectations." Id. at  105. The areas in which Acevedo did not meet the expectations during 2006 were the following: "Customer Quality-Focus," "Innovative and Creative," "Leadership" and "Empowerment-Accountability." Id. at 104. Specifically, in the area of "Leadership," Ceinos stated that: "[a] higher level of leadership is needed, specifically for the capital project that involved multiple departments within OTC. As an example is the TS CAR in which the engineering department is not leading the process. An overrun and a delay on the vendor's agreement was detected by the site leader. The plan to mitigate the consequence of the issues was not lead by engineering." Id. at 106. In the "Customer Quality-Focus" area, Acevedo rated himself as "Partially Met Expectations."  Id. at 107. Acevedo's self-rating was consistent with

the rating given by Ceinos in said area. Id. As in his 2006 Mid-year Performance Review, Acevedo again stated that "[t]he focus on Quality had been affected by three Unplanned Deviations. Three issues, coating with Purified Water with high TOC, fogging in the Choc. Mfg. Room without taking the appropriate measures and Rodent in Finished Goods Area. Rejection of two lots due to at a cost of around $90,000.00." Id.

Furthermore, Acevedo acknowledged again in his performance review that he was "[r]esponsible for all the matters related to the maintenance and engineering area. I am accountable and accept the calculated risks. I give responsibility to the mechanics and they accept it. Accountable for the delay of informing the over budget of the Thin Film Device." Ex-Lax's  SUF ¶ 108. Acevedo also rated himself as "Partially Met Expectations" in the "Empowerment-Accountability" and "Open Communication/Collaboration/Compassion" areas. Id. at 108-109. Acevedo also admitted during his deposition that the fogging and TOC incidents had a negative impact on the quality of Ex-Lax's products and finances. Id. at 110.

In this review, Ceinos once again stated the spare-parts room, the machine shop, and the USP water room were in unacceptable conditions...disorganized and the lack of cleanliness was evident." Ex-Lax's SUF ¶ 101. During his deposition, Ceinos admitted he had no evidence to show that he notified Plaintiff that the TOC or the fogging incidents could lead to his termination. PAF ¶ 50. When asked specifically what Plaintiff did regarding the TOC, Ceinos alleged that he is responsible for the training of his personnel. Id. at 51. Ceinos claims that the employees of the Engineering Department were not properly trained.  Id. at 54. However, the investigations related to the fogging, TOC or rats do not conclude that Ecolab or One Source were negligent in the performance of their duties. Id. at 53.

*Acevedo's termination*

Ceinos made the decision to terminate Acevedo approximately in October 2006. PAF ¶ 110; Docket # 89, p. 377.  Acevedo was terminated from his employment on February 23, 2007.

Ex-Lax's SUF ¶ 114. On that same date, Ceinos signed Plaintiff's 2006 evaluation. PAF ¶ 32 & 123.[8] Acevedo was 56 years old at that time. Id. at 81. His termination was effective immediately. PAF ¶121. Pabellon did not recommend nor support Plaintiff's termination, nor did he discuss Acevedo's performance with Ceinos. Id. at 97 & 98. Moreover, he does not remember whether Acevedo was placed in a progressive disciplinary procedure before his termination. Id. at 101. Pabellon could not explain why Acevedo was not given prior notice about his termination nor why he was not provided with a termination letter. PAF ¶121. Pabellon admitted there is no independent documentation that supports Ceinos' comments in the 2006 evaluation regarding the "Values and Behavior" section. Id. at 122.

Acevedo claims that his termination was discriminatory on account of his age because on two occasions, in August and December, 2006, Ceinos allegedly told him that Ex-Lax's plant's problem was that the persons that had been working for the company for a long time were not executing. Ex-Lax's SUF ¶ 116.  Notwithstanding, Acevedo never complained to Ex-Lax's Human Resources Department of the alleged comments made by Ceinos. Ex-Lax's SUF ¶ 121.

*Ex-Lax operations after Acevedo's termination*

Acevedo was replaced by Mariely Rivera, who was born in May 12, 1973, and began working for Ex Lax in February 2007. PAF ¶ 63 & 82.[9]  She was 34 years old when Ceinos

---

[8] Ceinos claims that he prepared the 2006 annual performance evaluation prior to that date, in November, December 2006 or January 2007. PAF ¶ 123 & 124.

[9] Although as Plaintiff points out, Ceinos alleged under penalty of perjury that Mariely Rivera was hired after Plaintiff was terminated (PAF ¶ 64) on February 23, 2007, the record shows Pabellon sent Rivera a letter confirming the offer of employment on February 2, 2007 (See Docket # 70-17). Thus Rivera was not effectively hired on said date, and there is no evidence showing when Rivera began to work for Ex-Lax. Even so, that is immaterial for purposes of the present motion insofar as Ceinos admitted that the decision to terminate Acevedo was made in 2006.

hired her. Id.[10]  Rivera reported directly to Carlos Ceinos. Id. at 84. Ceinos admitted that Rivera was interviewed before December 2006. Id. at 125. He further admitted that, in 2008, several animals entered the plant, and that no one was disciplined or reprimanded as a result of said incidents. Id. at 42; see also PAF ¶¶ 38, 39.3-39.8, 44-47.[11]

    *Age-based termination*

    The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The Supreme Court recently clarified that plaintiffs must "establish that age was the 'but-for' cause of the employer's adverse action." Gross v. FBL Fin. Servs., Inc., 129 S.Ct. 2343, 2351 (2009); see also Velez v. Thermo King de P.R., Inc., 585 F.3d 441, 446 (1st Cir. 2009). However, in contrast with other types of discrimination cases, "ADEA plaintiffs rarely possess 'smoking gun' evidence to prove their employers' discriminatory motivations." Id. (citing Arroyo-Audifred v. Verizon Wireless, Inc., 527 F.3d 215, 218-19 (1st Cir. 2008). The First Circuit has held that "ADEA plaintiffs who do not have 'smoking gun' evidence may nonetheless prove their cases by using the three stage burden-shifting framework set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)." Id. at 447. The McDonnell framework first requires a plaintiff to establish a *prima facie* case of employment discrimination by showing: "1) he was at least 40 years old at the time he was fired; 2) he was qualified for the position he had held; 3) he was fired, and 4) the employer

---

    [10]  Defendant contests that Plaintiffs failed to properly support their statement that Acevedo is 22 years older than Rivera. See PAF ¶ 82. However, said fact is easily ascertainable, considering that their birth dates are uncontroverted.

    [11]  Jose Colón also stated that Mariely Rivera was in charge when the animals entered the plant, and no one was disciplined as a result of the discovery of a butterfly and a cricket in the plant. Id. at 48.

subsequently filled the position, demonstrating a continuing need for the plaintiff's services."

Id. (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000)).

Once the plaintiff sets forth a *prima facie* case, he is entitled to a presumption of age-based discrimination. Id. Then the burden of proof shifts to the employer, who must "articulate a legitimate, non-discriminatory reason for its decisions." Id. (citing Arroyo-Audifred, 527 F.3d at 219). "If the employer articulates such a reason, 'the McDonnell Douglas framework -- with its presumptions and burdens -- is no longer relevant.'" Id. (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510 (1993). Thereafter, the plaintiff bears the burden of proving by a "'preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" Id. at 447-448 (citing Reeves, 530 U.S. at 143). That is, as previously stated, a plaintiff must show that his age was the "but-for" cause of the employer's adverse action. Id. at 448. In this context, pretext "means more than an unusual act; it means something worse than business error; pretext means deceit used to cover one's tracks." Kouvchinov v. Parametric Tech. Corp., 537 F.3d 62, 67 (1st Cir. 2008) (citing Ronda-Perez v. Banco Bilbao Vizcaya Argentaria, 404 F.3d 42, 45 (1st Cir. 2005).

In essence, Acevedo's age based discrimination claims hinge on two comments made by Ceinos. Ex Lax concedes, for purposes of the present motion, that on August and December 2006, Ceinos told Acevedo that Ex-Lax's problem was that the persons that had been working for the company for a long time were not executing. Docket # 89, p. 471.[12] Plaintiff took the

---

[12] Plaintiffs allege that pursuant to Acevedo's deposition, in August 2006, Ceinos told him that the problem that existed in Ex Lax relied in the employees that had been too long at the company specially, the older employees that worked in the maintenance group. PAF ¶107. However, Plaintiffs fail to include page 166 of Acevedo's deposition. Moreover, Defendant admits that Acevedo made that statement, but point out that on pages 167-170 Acevedo cleared up Ceinos' exact wording. This alone shows that Acevedo's comments at page 166 are self-serving conclusory statements that did not accurately reflect Ceinos' comments, and instead were Acevedo's interpretation of Ceinos' comments. As such, they are disregarded by this Court.

remark personally. PAF ¶ 107. However, these two isolated comments alone are not direct evidence of discrimination.

The First Circuit has held that "'stray workplace remarks' ... normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus." Gonzalez v. El Dia, Inc., 304 F.3d 63, 69 (1st Cir. 2002); see also Williams v. Raytheon Co., 220 F.3d 16, 18 (1st Cir. 2000) (rejecting age and gender claims where supervisor told colleagues that the company was run by "old, white men," that she intended to change the corporate culture, and would favor the hiring of women and younger people); Shorette v. Rite Aid of Maine, 155 F.3d 8, 13 (1st Cir. 1998) (asking the plaintiff "how old he was and when he planned to retire" was "a textbook example of an isolated remark which demonstrates nothing"); Pearson v. City of Manhattan, 33 F. Supp. 2d 1306, 1315 (D. Kan. 1999) (holding that phrase "old ways" is not evidence of ADEA age-based animus, as such terms "apply more to a person's state of mind than to a person's age"); Martin v. Ryder Distribution Res., Inc., 811 F. Supp. 658, 664 (S.D. Fla. 1992) (observing that simple references to the plaintiff-employees -- as "good old boys" and "old-fashioned" are insufficient evidence of age-based animus under ADEA). Thus more likely, these types of isolated comments would be considered stray remarks.

However, Ceinos' comments do not seem to be motivated by Acevedo's age, even if he admittedly "took it personally." Even more, "it is far from clear that the alleged remarks bespeak any age-based animus at all." El Dia, Inc., 304 F.3d at 69. Courts have held that "a statement that plausibly can be interpreted two different ways - one discriminatory and the other benign -- does not directly reflect illegal animus." Fernandes v. Costa Bros. Masonry, Inc., 199 F.3d 572, 583 (1st Cir. 1999); see also Speen v. Crown Clothing Corp., 102 F.3d 625, 636 (1st Cir. 1996) (holding that "'[a]mbiguous remarks, tending to suggest animus based on age, are insufficient, standing alone, to prove an employer's discriminatory intent.'") In analyzing Ceinos' comments, this Court notes that Ceinos did not even allude to Acevedo's or any

employees' age when he made the comments. More so considering that the fact that an employee has worked at Ex-Lax for a long time does not imply that said employees are within the protected age group, *i.e.* over the age of 40. Therefore, Plaintiffs' alleged direct evidence of age discrimination is insufficient.

Since Plaintiffs lack direct evidence of discrimination, the <u>McDonnell</u> burden-shifting analysis applies. On this point, Ex Lax concedes that Acevedo falls within the protected group, that he suffered an adverse employment action when he was discharged, and that he was replaced by someone younger with similar qualifications. Docket # 29-3, p. 8. However, Ex Lax contends that Acevedo fails to satisfy the second prong of the *prima facie* case test insofar as he did not meet the company's legitimate work expectations. <u>Id.</u> According to Ex-Lax, Acevedo's termination was a legitimate business decision unrelated to his age. Specifically, Ex-Lax contends that Ceinos' decision to terminate Acevedo was based on the Unplanned Deviation Reports regarding the 2004 and 2006 incidents in the maintenance and engineering area, and due to Acevedo's failure to comply with the established quality control standards. In opposition, Acevedo negates responsibility over the incidents which occurred at the plant, and which allegedly led to his termination. He further avers that Ex-Lax's proffered reason for his dismissal is pretextual.

Courts have pointed out that at the summary judgment phase, "courts should not unduly complicate matters . . . by applying legal rules which were devised to govern the basic allocation of burdens and order of proof." <u>Dominguez-Cruz v. Suttle Caribe, Inc.</u>, 202 F.3d 424, 430-431 (1st Cir. 2000) (citing <u>Mesnick v. General Elec. Co.</u>, 950 F.2d 816, 825 (1st Cir. 1991)). "Instead, the focus should be on the ultimate issue: whether, viewing the 'aggregate package of proof offered by the plaintiff and taking all inferences in the plaintiff's favor, the plaintiff has raised a genuine issue of fact as to whether the termination of the plaintiff's employment was motivated by age discrimination." <u>Id.</u> at 431.

Civil No. 08-1185 (SEC)                                                                    32

As in Morales-Figueroa v. Banco Bilbao Vizcaya Argentaria, 550 F. Supp. 2d 220, 226-227 (D.P.R. 2007), in his opposition, Acevedo attacks Ex-Lax's decision to terminate him, and tries to convince this Court that he is not accountable for the incidents that allegedly led to his dismissal; he does not contest than the incidents occurred. In this case, we find that Plaintiffs have shown that there is controversy as to whether Acevedo met Ex-Lax's legitimate work expectations. Specifically, Acevedo's responsibility, and Ex-Lax's losses, for the following incidents is unclear: the record shows that one of the possible causes for the microbial incident of 2004 was that one of the operators who participated in the inspection process was sick, see Docket # 57, p. 22, ¶30.2; the quality of the products as a result of the packaging process deviation was not negatively affected, see id., p. 32, ¶ 38.3; Acevedo was on vacation when the TOC parameter incident took place in 2006, see id., p. 62. ¶ 75.1; and the investigation report for the 2006 fogging incident concluded that the Pest Control Procedure (written procedure) failed to establish how to proceed when a pest control activity takes place, see id., p. 70-71, ¶ 84.2 & Ex-Lax's SUF ¶ 87. Pursuant to Rodriguez's testimony, if an employee succeeds a PIP, the factors that motivated the PIP cannot be used in support of discharging the employee.  PAF ¶117 & 118. Although Acevedo successfully complied with the 2005 PIP, and received a "Fully Met Expectations" rating in 2005 as a result thereof, his termination is in part based on his 2004 Performance Evaluation. See Ex-Lax's SUF ¶ 71. Accordingly, for purposes of the present motion, this Court finds that Plaintiffs have established a *prima facie* case under the ADEA.

Notwithstanding, for an employee "to withstand summary judgment in an age discrimination case, there must be some significantly probative evidence from which the factfinder can infer that the employer discharged the employee because of his age." Morales-Figueroa, 550 F. Supp. 2d at 226-227. Even finding that Plaintiffs established a *prima facie* case, that is, that he met his employer's legitimate work expectations, and considering "instead, whether there is evidence that, notwithstanding the employer's stated reasons for the

termination, the real reason, at least in part, was age ... discrimination,'" we find that there is no evidence from which to conclude that Ex-Lax's proffered reason for Acevedo's termination was not in fact the real reason. Fontanez-Nunez v. Janssen Ortho LLC, 447 F.3d 50, 56 (1st Cir. 2006) (citing Hillstrom v. Best Western TLC Hotel, 354 F.3d 27, 31 (1st Cir. 2003)).

To show pretext, Plaintiffs set forth various arguments. First, Plaintiffs argue that Acevedo's evaluations were satisfactory, and that he received performance bonuses and salary increases. They further point to Ex-Lax's non-compliance with its disciplinary policy prior to Acevedo's dismissal, and its alleged discriminatory hiring practices. Specifically, Plaintiffs submit statistical information to show that Ex-Lax incurred in a pattern of age based discrimination when hiring and firing employees.  Plaintiffs also point to Ceinos' alleged age-based recruitment plan. Lastly, they contend that despite lackluster performance, including the entrance of animals in the plant, Rivera was never disciplined nor received poor performance reviews for the incidents occurred in 2008.

At the pretext stage, "the question to be resolved is whether the defendant's explanation of its conduct, together with any other evidence, could reasonably be seen by a jury not only to be false but to suggest an age-driven animus." Ramirez Rodriguez v. Boehringer Ingelheim Pharms., Inc., 425 F.3d 67, 78 (1st Cir. 2005). Although Acevedo argues that Defendant's articulated reasons for his termination are a pretext and that he was terminated because of his age, "when assessing a claim of pretext in an employment discrimination case, a court's focus is necessarily on the motivations and perceptions of the decisionmaker," Davila v. Corporacion De P.R. Para La Difusion Publica, 498 F.3d 9, 17 (1st Cir. 2007), that is, whether the employer believes its stated reason to be credible." Mesnick v. General Electric Co., 950 F.2d 816, 824 (1st Cir. 1991) (citing Gray v. New England Tel. and Tel. Co., 792 F.2d 251, 256 (1st Cir. 1986)); see also Kouvchinov, 537 F.3d at 67.  Thus, "the issue is not whether [the employer's] reasons…were real, but merely whether the decisionmakers… believed them to be real."

Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 674 (1st Cir.1996); see also Morales-Figueroa v. Banco Bilbao Vizcaya Argentaria, 550 F. Supp. 2d 220, 226-227 (D.P.R. 2007) (citing Ronda Perez v. BBVA, 404 F.3d 42, 45 (1st Cir. 2005) (pointing out that in an age discrimination suit, "[t]he question is not whether plaintiff's or his fellow employees' version is the true one, but whether...his superiors believed what [they] had been told by those [they] interviewed."). Therefore, an "employee's perception of himself . . . is not relevant. [Rather,] [i]t is the perception of the decision maker which is relevant." Torrech-Hernandez v. GE, 519 F.3d 41, 49 (1st Cir. 2008).

Courts have held that "[t]his holds true even when the decisionmaker is relying on information that may later prove to be inaccurate. In other words, it is not enough for a plaintiff to show that the decisionmaker acted on an incorrect perception. Instead, the plaintiff must show that the decisionmaker did not believe in the accuracy of the reason given for the adverse employment action." Kouvchinov, 537 F.3d at 67. This is due to the fact that "anti-discrimination laws do not insure against inaccuracy or flawed business judgment on the employer's part; rather, they are designed to protect against, and to prevent, actions spurred by some discriminatory animus." Id. (citing Ronda-Perez, 404 F.3d at 47).

The First Circuit has noted that "courts in employment discrimination cases may not act as 'super personnel departments,' substituting judicial judgments for the business judgments of employers." Arroyo-Audifred v. Verizon Wireless, Inc., 527 F.3d 215, 221 (1st Cir. 2008); see also Davila, 498 F.3d at 17; Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 31 (1st Cir. 1990). Specifically, "as long as the [employer] believed that the [employee's] performance was not up to snuff -- and the [employee] has presented no evidence suggesting that management thought otherwise -- it is not [the courts'] province to second-guess a decision to fire him as a poor performer. That is true regardless of whether, to an objective observer, the decision would seem wise or foolish, correct or incorrect, sound or arbitrary." Davila, 498 F.3d at 17.

Therefore, the plaintiff needs to "show more than his employer miscalculated in deciding that he had outlived his corporate usefulness: good-faith errors in an employer's business judgment are not the stuff of ADEA transgressions." Morales-Figueroa, 550 F. Supp. 2d at 226 (citing Freeman v. Package Machinery Co., 865 F.2d 1331, 1341 (1st Cir. 1988)). As to the evidence needed on this front, the Supreme Court has held that proof that the employer's explanation is "unworthy of credence" is one form of "circumstantial evidence that is probative of intentional discrimination." Reeves, 530 U.S. at 147; see also Velazquez-Fernandez v. NCE Foods, Inc., 476 F.3d 6, 12 (1st Cir. 2007). However, when the plaintiff fails to show that his employer's findings were inaccurate, unbelievable, idiosyncratic, or misleading, there is no basis to conclude that its legitimate business decisions were motivated by age animus. Id. (citing Gray v. New England Tel. and Tel. Co., 792 F.2d 251, 256 (1st Cir. 1986).

*Performance evaluations*

In the present case, upon reviewing the attached relevant performance reviews, and the uncontested facts, this Court notes that Acevedo agreed with some of Ceinos' annotations regarding his performance. In the 2004 performance evaluation, Ceinos and Acevedo agreed he was fully accountable for the situations concerning Pest Control, compressed air, Micro OOS and packaging equipment, which negatively impacted the performance of the site. Ex-Lax's SUF ¶ 63. They also agreed that there were problems in the communication between the departments. Id. Acevedo also recognized that sometimes results were not as acceptable as they should be, *i.e*, the installation of new potable water piping, Brush box, Qualification of Gas-X with Maalox tablets change parts, that sometimes he did not spend the required time with each of his employees, and that he always felt responsible as to what his department did, good or bad. Id. at 64. Moreover, in his 2006 performance review, Acevedo stated that he was accountable for the delay in informing the over budget of the Thin Film device, and that he was responsible for all the matters related to the maintenance and engineering area. Id. at 108. Therefore,

Acevedo cannot now argue that Ceinos' opinions regarding his performance were inaccurate or unbelievable. Especially considering that Acevedo participated in some of the investigations, that he signed the performance reviews and has not shown that he objected to the same to the HR Department or to Ceinos.

Additionally, Ceinos' comments and ratings in Acevedo's performance reviews were based on the investigation results for each incident. That is, Ceinos believed the information provided in the Unplanned Deviation Reports and investigation reports was an accurate depiction of the incidents occurred, and Acevedo has not shown otherwise. Lastly, this Court notes that Ceinos rated Acevedo in 2005 as "Fully Met Expectations," which evinces a lack of animus towards Acevedo, insofar as he was accorded positive review by Ceinos despite previous performance issues.

In essence, Plaintiffs ask us to excuse Acevedo's performance by replacing Ceinos' business judgment with his own absent proof that his employer's findings were inaccurate or misleading, which is an untenable position in light of the applicable case law. Velazquez-Fernandez v. NCE Foods, Inc., 476 F.3d 6, 12 (1st Cir. 2007) (citing Webber v. Int'l Paper Co., 417 F.3d 229, 238 (1st Cir. 2005)(holding that "an employee's opinion of the efficacy of an employment decision, standing alone, cannot supplant the employer's business judgment.").

*Ex-Lax's hiring practices, disciplinary procedure and Rivera's performance*

In their attempt to show pretext, Plaintiffs further submit statistical information regarding Ex-Lax's hiring practices. Specifically, pursuant to the uncontested facts, after Ceinos was hired in 2003, a total of 17 employees were fired; 15 of those employees were over 40 years old. PAF ¶ 9. Moreover, Rodriguez, Ex-Lax's HR Manager of Ex Lax from 1997 to 2005, was 48 years old when she was terminated, and replaced by Pabellón, Ex-Lax's current HR Director; he was 39 years old when hired by Ex Lax. Id. at 65, 66, 67& 68.  Javier Garcia was replaced by

Civil No. 08-1185 (SEC)                                                                    37

Alexander Rochat, who was born in May 13, 1970. Id. at 69 & 70. Rochat was Ex-Lax's Site

Leader from August 2006; at that time he was 34 years old. Id. at 71.  Plaintiffs further submit

Ex-Lax's answers to interrogatories # 4 and 16 to support their argument that Ex-Lax engaged

in a pattern of age discrimination.[13]

         This Court notes that a "company's overall employment statistics will, in at least many

cases, have little direct bearing on the specific intentions of the employer when dismissing a

particular individual." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 848 (1st Cir.1993) (citing

Gadson v. Concord Hosp., 966 F.2d 32, 35 (1st Cir. 1992)). Although statistical evidence is

sometimes relevant to show pretext, the First Circuit has cautioned that such evidence may vary

greatly in its probative value. Bloomfield v. Bernardi Automall Trust, 170 F. Supp. 2d 36, 45

(D. Mass. 2001) (citing Blizard v. Frechette, 601 F.2d 1217, 1223 (1st Cir. 1979)). More to the

point, "one potential flaw in the statistical evidence may arise when the ages of employees are

given without any information about the age of the applicant pool. Specifically, 'the fact that

recently hired [employees] are younger than [the plaintiff] is not necessarily evidence of

discriminatory intent, but may simply reflect a younger available work force'" Id. (citing

LeBlanc, 6 F.3d at 848); see also Rodriguez v. Smithkline Beecham, 224 F.3d 1, 7-8 (1st Cir.

2000). Accordingly, "[w]ithout an indication of a connection between the statistics," the

practices of the employer, and the employee's case, statistics alone are likely to be inadequate

to show that the employer's decision to discharge the employee was impermissibly based on

age." Id. (citing Gadson, 966 F.2d at 35). Insofar as statistics alone are not likely to be probative

of whether the employer's decision to terminate plaintiff was based impermissibly on plaintiff's

--------

[13]  Interrogatory # 4 is list of Ex-Lax's employees that were terminated after 2003, with their
job title, termination date and birth date, and interrogatory # 16 is a table of all persons hired by Ex-Lax
after 2003, with their job title and birth date.

age, if unsupported by other probative evidence of age discrimination, they are insufficient to show a discriminatory animus.

This district has held that "the fact that recently hired employees are younger than [the plaintiff] is not necessarily evidence of discriminatory intent, but may simply reflect a younger available work force." Tirado Arce v. Aramark Corp., 239 F. Supp. 2d 153, 163 (D.P.R. 2003). As in Tirado-Arce, Acevedo failed to provide information regarding the pool of applicants or the composition of the relevant labor market. This alone leads us to finds that the statistics provided by Plaintiffs fail to create a triable issue of fact as to whether Acevedo was laid off for discriminatory reasons. Even so, upon reviewing the record, this Court notes that out of 171 employees hired, two were born in 1951, the year Acevedo was born; four employees were 50 or older, and 43 employees were over 40 years old.  Thus the statistical information provided by Plaintiff fails to show a clear pattern of age discrimination in Ex-Lax's hiring practices. Furthermore, it should be noted that Acevedo was 45 years old when he was hired by Ex-Lax, that is, within the protected group. This in itself lends support to Ex-Lax's position.

Additionally, this Court notes that, as to the 2008 rodent incidents, Ceinos explains that they are not attributable to Rivera insofar as a major construction took place during that period of time which made it impossible to eliminate the entrance of animals in the plant. Even so, Rivera's lackluster performance is not conclusive evidence that Ex-Lax's proffered reason for terminating Acevedo is pretextual. Especially considering that Acevedo's performance deficiencies began in 2004 and he was granted opportunities to correct the same. Even more, he was terminated in 2007, that is, three years since the alleged deficiencies were first commented upon by Ceinos.

Lastly, it should be noted that Ex-Lax's alleged non-compliance with the disciplinary process is irrelevant for purposes of an ADEA claim. Notwithstanding, the record shows that exempt employees were not usually disciplined through the standard disciplinary forms, and

instead the areas to be improved are identified via memos or the mid-year and annual performance reviews. See Docket # 89, pp. 465, 467-468. As such, the evidence suggests that Ex-Lax adequately complied with its disciplinary process in Acevedo's case.

> *Recruitment Plan*

While arguing pretext, Plaintiffs also contend that when he was hired as Site Leader in 2003, Ceinos asked Rodriguez to prepare a recruitment plan to evaluate how the employees close to retirement age would be replaced. PAF ¶ 102. He also sought to know whether said employees would retire or stay at Ex-Lax. Id.  The employees approached had to be 55 years old, and have 5 years of service or more at Ex-Lax. Id. at 105. According to Rodriguez, the purpose was to substitute these persons and initiate a recruitment process. Id. at 103. Ceinos testified that the recruitment plan was based upon the fact that there were a substantial amount of employees in key positions near the retirement age, which could lead to numerous simultaneous vacancies for an extended period of time. See Docket # 89, p. 469. Ceinos believed this could negatively impact Ex-Lax's operations. Id.

On this point, the First Circuit has held that "company officials are permitted to gather information relevant to personnel planning without raising the specter of age discrimination." Wallace v. O.C. Tanner Recognition Co., 299 F.3d 96, 101 (1st Cir. 2002) (citing Cox v. Dubuque Bank & Trust Co., 163 F.3d 492, 497 (8th Cir. 1998) (holding that "[m]any courts have recognized that an  employer may make reasonable inquiries into the retirement plans of its employees."); Colosi v. Electri-Flex Co., 965 F.2d 500, 502 (7th Cir. 1992) (finding that "a company has a legitimate interest in learning its employees' plans for the future, and it would be absurd to deter such inquiries by treating them as evidence of unlawful conduct.") Even "an offer of early retirement is not, on its own, evidence of discriminatory animus." Baralt v. Nationwide Mut. Ins. Co., 251 F.3d 10, 16 (1st Cir. 2001); see also Alvarez-Fonseca v. Pepsi Cola of Puerto Rico Bottling Co., 152 F.3d 17, 27 (1st Cir. 1998); Vega v. Kodak Caribbean,

**Civil No. 08-1185 (SEC)**                                                    **40**

Ltd., 3 F.3d 476, 480 (1st Cir. 1993). Even so, Rodriguez clarified that there was no recruitment plan in place to transfer those employees that refused to retire. Instead, a sole employee was approached by her supervisor, not Ceinos, and informed that if she did not retire, she would be transferred. Pursuant to Rodriguez's testimony, this was an isolated incident. Therefore, Plaintiffs did not show a clear generalized pattern or plan on Ex-Lax's behalf of pressuring employees to retire. Moreover, Ex-Lax's proffered reasons for evaluating which employees are close to retirement age is reasonable insofar as the company must ensure that all key positions are filled when employees retire.

Lastly, it should be noted that even "[d]iscrediting defendant's proffered reasons does not automatically entail a finding of age discrimination." Machin v. Leo Burnett, Inc., 376 F. Supp. 2d 188, 200-201 (D.P.R. 2005). Therefore, even a plaintiff's showing of pretext does not necessarily defeat a defendant's summary judgment motion. Such finding requires "sufficient evidence in the record for a reasonable factfinder to infer that plaintiff's termination was due to his age." Id.

After reviewing the record, this Court finds that Acevedo has not presented any evidence to demonstrate that age discrimination was the real reason for the termination - or even a motivating influence in the decision. Fontanez-Nunez, 447 F.3d at 56 (citing Reeves, 530 U.S. at 141). Ceinos' alleged age-based comments are far from indicative of age-based animus. Moreover, given Ex-Lax's proffered reasons for Acevedo's termination, even assuming that the above-mentioned stray remarks made by Ceinos - which we already held are unrelated to Acevedo's age - were in fact age related, they do not allow us to infer that Ex-Lax's real motivation was his age.

As such, even if Acevedo received performance bonuses and salary increases, this does not alone show age-based animus.[14] There is not a single reference to Acevedo's age at any time by any witness or in any document. The only evidence submitted by Plaintiffs are Ceinos' comments regarding employees who have been working at the plant for a long time which have been discarded as age motivated. As a result, even if Plaintiffs discredited Ex-Lax's proffered reasons for Acevedo's dismissal, there is no proof that his termination was because of his age.

The First Circuit has noted that "federal law does not protect generally against arbitrary or unfair treatment in private employment, but only against actions motivated by listed prejudices such as race, age and gender...Discrimination is a form of unfairness; but not all unfairness is discrimination." Sabinson v. Trs. of Dartmouth College, 542 F.3d 1, 4 (1st Cir. 2008) (citations omitted). The "'ADEA does not stop a company from discharging an employee for any reason (fair or unfair) or for no reason, so long as the decision to fire does not stem from the person's age.'" Hidalgo v. Overseas Condado Ins. Agencies, 120 F.3d 328, 337 (1st Cir. 1997) (citing Mesnick, 950 F.2d at 825). Thus while Acevedo may be entitled to other remedies due to his dismissal, the ADEA is inapplicable to the case at bar.

In light of the foregoing, this Court finds that Plaintiffs have failed to establish that a genuine issue of material fact exists as to pretext. Accordingly, Ex-Lax's request for summary judgment as to Plaintiffs' age discrimination claim is **GRANTED**.

*Harassment*

Courts have recognized claims for harassment other than sexual harassment, to wit, verbal abuse (racial epithets), pranks and other forms of hazing. DeNovellis v. Shalala, 124 F.3d 298, 310 (1st Cir. 1997). However, not all offensive conduct is actionable as harassment, since trivial offenses do not suffice. Id. (citing Meritor Sav. Bank v. Vinson, 477 U.S. 57, 67

---

[14]  Albeit bonuses and salary increases may meet the showing required for a *prima facie* case, our analysis is at the pretext stage.

**Civil No. 08-1185 (SEC)**                                                    **42**

(1986). For example, in order to establish a Title VII[15] claim for sexual harassment under a hostile environment theory, the conduct must be "'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive [or hostile] working environment.'" Id. (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). In this analysis, "courts look to the gravity as well as the frequency of the offensive conduct." Id. at 311.

More specifically, to succeed in a hostile workplace environment claim under the ADEA, Acevedo must show: (1) that he is a member of a protected class; (2) that he was subjected to unwelcome harassment; (3) that the harassment was based on his membership of the protected class; (4) that the harassment was so severe or pervasive that it altered the conditions of his employment and created an abusive work environment; (5) that the objectionable conduct was objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established. Torres-Negron v. Merck & Co., 488 F.3d 34, 39 (1st Cir. 2007) (citing O'Rourke v. City of Providence, 235 F.3d 713, 728 (1st Cir. 2001)). A plaintiff must establish that he "suffered an adverse job action, that this was motivated by age, and that he suffered injury as a result of it." Collazo v. Nicholson, 535 F.3d 41, 44 (1st Cir. 2008) (citing Melendez-Arroyo v. Cutler-Hammer de P.R. Co., 273 F.3d 30, 33 (1st Cir. 2001).[16]

The First Circuit has explained that "an employer's liability for a hostile work environment claim depends on the harasser's employment status relative to the victim's."

---

[15]  Because of their similarity, courts have analyzed ADEA claims under the same framework as claims under Title VII. See Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121 (1985).

[16]  Although this Circuit has recognized hostile work environment claims under the ADEA, it is well-established that the statute does not allow compensatory damages for pain and suffering. Collazo v. Nicholson, 535 F.3d 41, 45 (1st Cir. 2008) (citing Vazquez v. E. Air Lines, Inc., 579 F.2d 107, 109 (1st Cir. 1978). Instead, the ADEA only allows awards for "'pecuniary benefits connected to the job relation,' including unpaid wages or overtime compensation.'" Id. (citing Kolb v. Goldring, Inc., 694 F.2d 869, 872 (1st Cir. 1982).

<u>Merck</u>, 488 F.3d at 40.  Therefore, Ex Lax is vicariously liable if Acevedo's supervisor at Ex Lax created a hostile work environment, whereas if a co-worker created the hostile work environment, Ex Lax will be held liable only if it was negligent either in discovering or remedying the harassment. <u>Id.</u>

Pursuant to his deposition testimony, Acevedo's harassment claim is based on the following: (i) Ceinos held Acevedo responsible for the maintenance and engineering incidents that occurred in the plant; (ii) in 2006, Ceinos allegedly raised his voice when talking to Acevedo in relation to some disagreements regarding the plant's cleanliness; specifically, Acevedo stated that Ex-Lax's facilities were clean and organized, while Ceinos stated that they were dirty and disorganized; (iii) Ceinos allegedly stopped talking to Acevedo; (iv) Ceinos allegedly started to take the lead in a project which had been previously led by Acevedo and excluded him from the project; (v) on one occasion, Ceinos allegedly became angry with Acevedo because he allegedly informed Ceinos' supervisor of a disagreement he had with Ceinos as to how to work with an "over budget," and (vi) Ceinos stopped inviting Plaintiff to the work meetings regarding big projects and he was excluded from the objectives. Ex-Lax's SUF ¶ 122; PAF ¶ 109, 111-113.

As previously stated, the ADEA is not applicable in the present case because Acevedo has not shown age-based animus. As such, his age-based harassment claims fail as well. Notwithstanding, this Court finds that the incidents Acevedo provides in support of his harassment claims are insufficient to withstand summary judgment. Specifically, the conduct Acevedo sets forth is not sufficiently severe and offensive to create a hostile work environment. This is evidenced by the fact that Acevedo never informed the HR Department about Ceinos' alleged harassment, despite knowing the mechanisms available within Ex-Lax. Moreover, according to Acevedo, he was unaware that the maintenance and engineering incidents that occurred at the plant were attributed to him. Insofar as the gist of his opposition to Ex-Lax's

**Civil No. 08-1185 (SEC)**                                                              **44**

motion is that he was never advised that said incidents could lead to his dismissal, Acevedo is

now barred from claiming that he was harassed by the same conduct he claims was never

effectively brought to his attention.  As such, Plaintiffs' harassment claims are **DISMISSED**

**with prejudice**.

        *Supplemental law claims*

        Having dismissed Plaintiffs' federal law claims against Ex-Lax, Plaintiffs' state law

claims are also dismissed. See Newman v. Burgin, 930 F.2d 955, 963 (1st Cir. 1991) (holding

that "[t]he power of a federal court to hear and to determine state-law claims in non-diversity

cases depends upon the presence of at least one 'substantial' federal claim in the lawsuit.").

        **Conclusion**

        In light of the foregoing, Defendant's motion for summary judgment is **GRANTED.**

Accordingly, Plaintiffs' federal claims are **DISMISSED with prejudice**, and their state law

claims are **DISMISSED without prejudice.**

        **IT IS SO ORDERED.**

        In San Juan, Puerto Rico, this day of 30th day of September, 2010.

                                        *S/ Salvador E. Casellas*
                                        SALVADOR E. CASELLAS
                                        U.S. Senior District Judge